This is our second case of the morning, 4090913 K. D. v. Grove community Unit School district for the appellant, Mr. Wright, for the appellee, Ms. Wakeland. Ready to proceed? I adjourn. May it please the Court, good morning. My name is Brandon Wright, and I represent the defendants who bring this appeal from the Circuit Court of Douglas County, the v. Grove community Unit School district, and Dr. Steven Posnick, the superintendent. The district brings this appeal because the decision below creates what the district believes to be a difficult and unmanageable situation in a public school classroom, and seeks the clarity of this Court to apply the law as both reason and the plain and fair meaning of the statute dictate. This case is not about, or is not intended to be about, some general notion regarding service dogs, service animals, or the concept of an autism service dog. The district understands, respects, and is ready to apply the law, both the specific statute in this case, section 14602 of the school code, and other state or federal laws that may apply. Well, just stop writing there. What other federal law is at issue here? There are other federal laws that may implicate the use of a service animal. Why do they do that? What part of section 14602 makes reference to federal statutes? It doesn't. Why do you mention it? What I mean by that is that plaintiffs could have brought an action under a federal statute. But they didn't. That's correct, Your Honor. So why do you mention federal statutes? I do so because I think that there is very limited jurisprudence under this. As a matter of fact, until this year there was zero jurisprudence under this particular state statute. But there's been a lot of case law and regulatory commentary on the federal level. There seems to be an effort in your brief and theory before this court of linking the state and federal statutes. And the state statute appears to be different from these others and to stand on its own. I'm wondering about the legitimacy of the linkage. I think that the importance for the court is what the district asked the trial court to do. And what it does in its brief today is to say that there is such an analogy there between the two. That while it's certainly not binding, and there's certainly nothing in the federal case law that would be binding on this court in any way, we think that the reasoning applied, particularly in the Cave case, for example, which I think, while it's a federal circuit court case, But the statute's different. Dramatically different. I don't know that I would say it's dramatically different. I would say that they are not identical. That is true. But that's notwithstanding, I think that if the animal in this case were an animal trained to perform tasks for the benefit of a student with a disability,  and that responsibility is this, to permit such an animal to accompany the student with a disability. And so I think that there are three issues that the district brings. One, a question of the exhaustion of administrative remedies. And then secondly, looking at whether or not this dog meets the definition of a service animal. And lastly, whether or not it is even possible, under the record, for this dog to accompany the student at school. And whether permission would even be a worthwhile endeavor. And I think that it's viewed on two important grounds. First, the trial court's interpretation of the meaning of section 14602 of the school code doesn't properly consider the training, the performance of tasks, and the benefit to the student required. And I believe the plaintiffs are seeking, by their own admission, more than mere permission for the dog to be present at school. As he would be incapable of doing so without the universal assistance of an adult handler at school. And plaintiffs admit as much, in their record, as well as in their brief. Now I think the first issue on appeal, and one I want to touch on briefly, is related to the exhaustion of administrative remedies. Now the district's aware of, and has addressed in its brief in reply, the application of the Cobb-Fleisch case to this one. But we believe the reasoning in Cobb-Fleisch does not apply, and for two important reasons. First, if you read the 5th District's opinion, the 5th District didn't give the issue, I think, a full and robust discussion. Because they believed that the issue was not properly before them. As, in that case, it was a limited interlocutory appeal. Which is distinct from this case. So I'm not sure that, if you look at the treatment that the 5th District gives on the issue of exhaustion in Cobb-Fleisch, that they gave it as robust a review as we would ask this court to do. And also I think the futility argument fails. One that's raised both in Cobb-Fleisch and by plaintiffs. I think there are some important factors which report to you in the district's brief in reply. First, that the plaintiffs sought the inclusion of the service dog in the student's individual education program. His IEP. But failed to challenge the IEP team's decision through the administrative process. Which is the only means for challenging an IEP team decision under both state and federal law. Secondly, the plaintiffs could seek precisely the relief they seek via the special education due process hearing system. Including a hearing officer could order interim relief pending a final decision. A hearing officer would have that authority. And lastly, that the plaintiffs are not seeking mere access to school akin to a public accommodation. They're not just asking for permission for the dog to be at school. By their own admission, it requires affirmative educational services. It requires a significant change in the student's educational program. That must and does implicate the entirety of this educational program. And therefore, because what they are seeking is ultimately an affirmative educational service on behalf of the school district. I think the administrative process outlined in Article 14 ought to apply. And we also addressed the issue in our brief that we believe that Article 14 needs to be read in peri materia. Meaning that, you know, this statute, 14602, is not in any other article of the Illinois School Code. But it's in the special education article. Which sets forth a process and a hearing system through which a party can challenge a decision related to the identification, evaluation, services, and placement of a child with a disability. And I think that's exactly what's implicated in this case. And the statute in 14802A says that only a person aggrieved by a hearing officer's decision can bring a civil action on that issue. And so I think that reading that in peri materia requires the court to say that the plaintiff's required to have exhausted their administrative remedies prior to filing. How long would it have taken to do so? Under the statute and the Illinois State Board of Education regulations, without any agreement of extension by the parties, 75 days. There's a 30 day resolution period and then from that period there are 45 days in which the hearing officer can order the, conduct a hearing and issue an order. And they could have done so, the decision of the IEP team was made in December of 2008. And the last meeting was made under the record in May of 2009. So they certainly could have requested a special education due process hearing. And that could have been completed even if they had requested it as late as May of 2009, prior to the beginning of 2009-10 school year, which is when the job was to be presented. This argument really connects with, despite the fact that it's an exhaustion of remedies, it really relates to what's going to happen at a hearing, whether the hearing is before, is an administrative hearing or whether it's before a court. It seems as if you're asking us to look at the Illinois statute and think about what it might mean in a federal context, as opposed to what the trial court pretty squarely faced the issue and said, this is what it says, this is Illinois law. I'm not really interpreting anything. Well I think that you can take, I mean you can take the federal question out of it entirely. I mean the rest of Article 14 is linked very closely to the federal IDEA, Individuals with Disabilities Education Act. Well is this a case where a decision has been made as to how the animal can be used, if it's present in the school setting, and how many hours it can be with the child, and what activities the child can engage in when the animal is present. Those are the kinds of things that would involve the expertise of the school district, the expertise of educational service providers. Well we decided to do this because this worked better than this. That's not what this case is about. Maybe it ought to be in the future sometime, I don't know. But that's not the question that was presented about, well you can use the dog for this purpose, but you can't use it for this purpose. No, the dog can't be there. And I would assert, Your Honor, that even its very presence has the kind of impact on the entire education program of the student. I think probably walkers and wheelchairs and carrying children to the bathroom, I mean all of that stuff has impact on the other kids and on the educational process. And those are all items and issues that are resolved through the IEP and administrative process regularly. To me there's no distinction between those kinds of services and this form of educational service. And that those are services available under Article 14, just as this is a service available under Article 14. And if a parent were challenging toileting training, or the use of an individual care aid, or a particular amount of service in a special education program, they would do that through an Article 14 due process hearing. And the district position is there's no difference between any of those forms of educational services and those that are attached to the permission to allow the service dog. Particularly in this context when, by the record, it's very clear in this, and plaintiffs don't disagree with this, that the child is incapable of being in control and supervision of the dog on his own. As a matter of fact, the testimony at trial by Ms. Witko, for the plaintiffs, said that in fact the dog was trained not to respond to the student. It was part of the dog's training. And that becomes problematic because as districts got testified at trial, the dog in fact does respond to the student when it's not supposed to in inappropriate circumstances. As well as other things that call into question the training which I would raise momentarily. So I think that what is being requested is in fact an affirmative educational service. Despite, I think if you look back, in the amended complaint that plaintiffs filed and that the trial court ultimately struck portions of their prayer for relief, there was a request for multiple educational services, not just permission to go out to a company. And the trial court struck everything that was anything more than permission to a company because he said that's all that the statute provides for. But I think that in fact notwithstanding, you can't divorce the fact that at trial the record is clear that all of those issues, all of those affirmative educational services that are incumbent upon the school district with the dog's presence at school, that those are married and those things cannot be considered separately because they're so intertwined. That it would be impossible for the school district to just open the door and let the dog and the child in and have them make it through the school day without the dog receiving universal assistance. Not just the child, but the dog. And I think that that's significant, not only to the exhaustion argument that the district raises, but also to the issue of whether or not the child can even be accompanied by the dog in the meaning of the statute, which I think is particularly important. If I were to address that issue, I think that there is no way, based on the record, and the record is clear, that the dog can accompany the student in the meaning of the statute. And the plaintiffs argue in their brief that we need to give the term accompany its plain meaning. And I think if you do so, based on the record, that the dog at best perhaps accompanies the adult handler and not the child. Because the dog is unable to accompany the student without the constant direction of a handler. And the fact that the dog could not be present at school without personnel providing 100% of the dog's care and control is uncontroverted. And therefore I think mere permission for the dog to be at school would be useless. You know, the dog, as the district maintains the record shows at trial, and the testimony of both the plaintiffs' witnesses, and particularly the school district witnesses, that the dog doesn't meet the definition of a service dog for many reasons. It doesn't adhere to its training. It would be absurd to say that a trained dog means that I went through training, but I'm not able to apply it. And so I think that the trial court erred in interpreting that statute in that way to say, and I think if you read the trial court's comments when rendering his decision, to say that a dog who has been trained but is unable to then apply and follow that training then somehow continues to meet the definition of service animal I think is absurd. And I think that's an important factor for this court to look at. I think the statute does not create a right of access for a dog that is unable to adhere to its training, that is unable to benefit the student with a disability, and is unable to accompany the student without universal assistance. And I think that the case might be very different. And we may not even be here today if this were a case of a student who had the capability of being in control of the dog during the school day. But I think that factor is perhaps the most important factor in this case. Because it goes to each of the three issues before this court. It goes to the issue of the exhaustion of administrative remedies, and whether what we're talking about is really an affirmative educational service, or whether it is mere permission. It goes to the issue of whether or not the dog is properly trained, whether or not it benefits the student, whether or not what the dog does are actually tasks that it performs for the benefit of the student. Because as school staff testified, if you apply plaintiff's logic, all the dog has to do is to breathe and sleep at school, and it is somehow performing tasks. And it goes back to that issue of the distinction between what might be considered a therapeutic animal, a companion animal, and a true service dog. And I raise this again because... Is there any mention of therapeutic animals in the statute? Not in the state statute, no. That's all I'm concerned with here, counsel. I understand. And I think that what the plaintiffs are asking this court to do, and what they ask the trial court to do, is expand this statute, I think beyond its limits, in determining what it means to perform tasks that benefit a student with a disability. The trial court made its ruling in November of 2009? That's correct. And previously it entered a preliminary injunction? That's correct. That was back in July? That's correct. I'm curious about your position regarding the affidavits that were filed July 28 in this case. Were they presented to the court at the November hearing? They were not. When did you first see them? They were handed to me by plaintiff's counsel prior to the July hearing that never took place. Well, prior to the November hearing, did you move to strike them or call them to the court's attention and say, what is all this? No, we did not. At that time, we did not know that they were actually filed. We did not know they were part of the record until we received the record. But one of the affidavits testified anyway, did you not? That's correct. What about the other two? They did not. Okay. Is there any particular expertise that the administrative agency would have in determining what is a service dog under the statute? A due process hearing officer is trained in multiple aspects of not only making determinations based on precedent in the area of student disabilities, but also is to have had training on students with disabilities and the services provided there too under the statute. So a due process hearing officer who regularly handles cases regarding, for example, autism and other related services I think would certainly have the unique expertise necessary to be able to give a full and robust view of this case and the facts thereof. I think that a due process hearing officer is going to be in a much better situated place to be able to provide testimony, to look at the testimony and opinions of all witnesses and school staff. An issue in this case is the statutory definition, construction of it, of section 14-602's definition of service animals. Is that right? That's correct. When was that statute added to the school code? In 1993, I believe, Your Honor. And was that before or after the respective federal statutes that you say it should be construed in light of? It was after, Your Honor. And what I would argue is that the difference between the federal statute and this, the federal statute gives permission for a service animal to accompany a person with a disability in a place of public accommodation. And what I would argue is all this statute does is to expand the classroom, but not generally, to be interpreted to be a place of public accommodation. Why do you think the legislature came up with the less restrictive definition of service animal than that which appears in the federal statutes? Well, the trial court's opinion was that they did a poor job of writing the statute. What's your opinion? I would concur in that opinion. I think that a one-sentence statute does not give the guidance to school districts who are forced to make these decisions that would be useful. What does it mean? Well, short of they made a bad, short of the legislature was wrong, since we really, I suppose, ought to construe it as doing something that they intended. What was their intent in coming up? To put it more bluntly, if you're arguing to this court that we should construe this statute in the context of federal laws which were in existence when this statute was drafted, why did the legislature draft it differently than those laws? Why didn't it just track them? Well, if you look at the legislative history, which is limited, this was originally a much longer bill that included issues in terms of liability, and ultimately the legislative history reflects that as a way of compromising to get it passed, they struck more than a paragraph from the article. So my guess is that that happened as a way of legislative wrangling to get it passed rather than any particular thought to what the fact is. Well, how about this as an idea? They thought the federal statutes were overly restricted. I would say yes to the extent that they're adding to the place where a person with a disability could bring a service animal would be a school classroom. But I think ultimately this question is an answer to the fact that this animal is not a service animal. It is so far beyond what has ever been contemplated under the federal statutes as a service animal. The plaintiffs are asking us to take a much broader view. Well, you see, though, if the legislature rejected those ideas, then the statute would reflect that, that they didn't want the restrictions of the federal statutes. Isn't that right? That's conceivable, Your Honor, yes. As opposed to the alternative is they're stupid and wrong. That's the only legislative construction? That's possible. Which of those two do you suppose this court should adopt? Well, what I think this court should adopt is to, despite the legislative intent, even under the statute as it's written, this dog is not trained, does not perform tasks, does not benefit a student with a disability, and is not capable of accompanying him to school. And therefore, the trial court erred in finding that it was a service animal in the meaning of 14602. Thank you, counsel. We'll hear from you on rebuttal. Thank you. May it please the court. My name is Margaret Wakelin, and I'm representing the appellees, Caleb Drew and his parents, Nichelle and Brad Drew. Appellants are asking this court to overturn the finding of the circuit court that Caleb's parents showed with clear and convincing evidence that Chewy is a service animal within the meaning of the Illinois school code, and that by not allowing Chewy to accompany Caleb in school, the Villagrove School District violated the school code. Was there something wrong with starting with an administrative hearing? Well, in this case, there are several problems with the administrative hearing, in that the hearing that appellants have argued that Caleb's parents should have requested would be futile and inadequate, and in addition, requiring the lengthy administrative review would have caused irreparable harm to Caleb. In terms of the administrative hearing being futile and inadequate, the first basis is that Caleb's parents have brought this claim under the Illinois school code, which is the only statute. There's no federal statute that speaks directly to students with disabilities using service animals within the classroom. Although appellants have tried to make this about the federal law, this is about the Illinois school code, which is the only statute that speaks to the specific right that Caleb had that the district was denying. And within the school code, there is an administrative due process hearing for issues that involve the actual or proposed placement of a student with a disability, the identification, the services, and the evaluation of a student with a disability. The framework for the administrative due process hearing within the school code does not contemplate the analysis of what is a service animal that a student is entitled to have accompany him in the classroom. And thus requiring Caleb's parents to exhaust an administrative remedy that the legislature did not intend for them to have to would be futile. And it's not clear, there are no decisions that have been rendered, that a hearing officer would even have this authority to grant this relief, to say to a school district that they must allow a service animal to accompany a student with a disability. The analysis within the school code is not an analysis for the administrative due process hearing. That analysis is whether the school district has provided the student with the free appropriate public education that is guaranteed by the federal law. That's what the administrative due process hearing is. But the analysis under the service animal provision of the school code is whether an animal meets the definition of a service animal, which is that the animal is individually trained to perform tasks for the benefit of a student with a disability. And after, in November, after a full evidentiary hearing where appellants had the opportunity to present evidence to refute that Chewy is a service animal, the circuit court found that Caleb's parents had shown with clear and convincing evidence that Chewy was a service animal. That was in November? That was in November, yes. The district in its reply brief points out several instances in which they claim you have misstated facts or included facts not supported in the record and included affidavits that are inappropriate to be included. There is no cerebral brief, so you haven't had a chance to respond, but I'd be interested in your response to those contentions now. Well, in terms of the affidavits, those were filed with the circuit court on July 28th. They were attached with plaintiff's memorandum in support of the motion for preliminary injunction that was also provided to the defendants at the time. And those would, under Supreme Court Rule 231, those would be part of the common law record because they were filed with the court. When did you call them to the attention of the trial judge? Well, he had the opportunity to review them before we were meeting for the motion for the preliminary injunction. We're reviewing the November 2009 order, are we not? We are reviewing it. Okay. And what pertinence did those affidavits have to that the order entered then? Well, in terms of the preliminary injunction, the motion for the temporary restraining order, that is all enveloped within the order. Appellants are now challenging the, they've brought an argument that they raised at the hearing for the temporary restraining order, and they also, this is the exhaustion argument, they also raised it with the preliminary injunction. And so those affidavits are part of that record. Appellants have put that issue before you today, and the affidavits were part of the record, the common law record, for you to review. Did these people testify in November? Michelle Drew did testify. What about Kitty Coe? Didn't she testify in November? Katie Whitcoe did as well, and she's also one of the people who submitted an affidavit. Why did you attach them to your brief? Because they were part of the common law record. Well, you know, we're a court of review, counsel. We review stuff before the trial judge. How does it work if you have witnesses who testified at a November hearing? Why, what is the judge supposed to be doing about their affidavits back from a July proceeding? Why does that matter? In that that was part of his decision at, well, in front of him when. That's my first question. We're reviewing the November order, are we not? Yes, we are reviewing the November order. So what's with the affidavits? And it was just because they were part of the common law record, we thought that they should be appended with this in addition. The common law record can frequently, and perhaps in this very case, be a dump for whatever parties wish to drop in there. We're talking to several decades' worth of trial judge experience here on this bench, and it seems to me that if you're going to be arguing something before the trial court, dumping affidavits, you say, by the way, here's this affidavit, and I'd say at the November hearing, well, I'm not interested in the affidavit, counsel, especially when these people are here to testify, so don't even present it to me. And I guess it is within the discussion of your honors whether you will give any weight to those affidavits or not. What about the claims of other stuff in here that are just wrong, or things where objections were sustained, like how much it costs for this dog and there was a community fundraising effort? What's that have to do with anything, and why is that in this brief? Well, these were, again, part of the common law record in that they were part of the complaint. Was there an objection made to some of this and sustained by the trial judge? The objection was made regarding the cost of the service animal. It's in your brief anyway? It is, in that the objection was to relevance, and again, it is up to your discretion whether you'll give that any weight or not. Are you appealing on the grounds that that was an incorrect decision? Is there some kind of cross-appeal here? We did not cross-appeal on that. So we should ignore the trial judge's ruling as apparently you have? No, I would not argue that you should ignore the trial court's ruling. Well, what relevance does it, if this, the dog costs $13,500, but if it only costs $2,500, then you lose? No, that has no relevance to the analysis of whether this is a service animal under the Illinois school code and must be permitted to accompany the student in school. And any reference to that within our brief is free for you to disregard as irrelevant as well. Other than at school, Chewy and Kellogg have not been denied access to any other accommodation or business since they've been working together as a team. You provide no citation for this assertion, and they claim that no such testimony was offered at trial. Are they right? They are right, and that was contained within the affidavit. Well, counsel, we're a court of review, and we don't expect to be presented with stuff that wasn't in the record. And I guess that was my own mistake in that thinking that anything that was filed under the rule of Rule 231 was part of the record on appeal. And in terms of... Well, if we're looking at the school code, then why do we care whether a service animal is allowed in the barbershop or the grocery store? I mean, it doesn't matter whether it's in the record or not in the record or it's in an affidavit. That testimony probably wouldn't have been admitted. And even if admitted, it has absolutely nothing to do with the narrow issue upon which you are asking us to sustain the trial court's ruling. And the bottom line is the emotional factor, the cost, the fundraisers, the assertion that Chewy is an important companion during other parts of the child's life doesn't work to do anything and undermines your presentation. Well, I would argue that the fact that Chewy does use... or that Caleb does use Chewy in other... In other ways. In all areas of his life is relevant. That is part of the statute. You would assert that's part of the statute. That is part of the statute because... But it would be good then that that were focused on and there was some testimony about that as opposed to unsupported assertions. And that's true. And that Chewy is a tool that Caleb uses throughout all aspects of his life. And that was one question that was asked of counsel. And in school, he's also... Chewy's also with him during the entire day. And there are limited periods where Caleb is not directly attached by the tether to Chewy. And those are during recess and during PE because of the physical exertion. However, and importantly, Chewy... Caleb's parents are asking that, as is Caleb's right within the school code, that he be able to use the tool that he uses at the McDonald's in the park at his home to ameliorate the effects of his disability. That he be able to use that same tool within the school setting, as is his right under the Illinois school code. And in terms of the... and how those administrative remedies are inadequate, the circuit court in the earlier decision found that it would be irreparable harm for Caleb to not be able to be accompanied by Chewy in school. And this is consistent with the finding of Illinois courts and courts across the country that irreparable harm results when a person with a disability who uses a service animal is separated from that service animal. And if Caleb's parents were forced to request an impartial due process hearing, as appellants have suggested, the 75 days that it would take, even if the timelines were adhered to, the 75 days would be 75 days where Caleb would face irreparable harm because he wouldn't be able to attend school with his service animal. There would be a loss of his service animal skills. And this was testified to at the hearing, that the bond that Caleb and Chewy formed together, that builds as they work together, is important for the work that they're going to be doing. And thus, because the lengthy administrative review that Illinois courts have found, that if a litigant will face irreparable harm due to the lengthy administrative review, then even if administrative remedies are available, which in this case we argue that they are not, that the litigant should not be required to endure that irreparable harm during the lengthy administrative review. In addition, there was testimony regarding this being, Caleb's parents requesting an educational service. And appellants have argued that they have requested an educational service. They have only requested that Caleb be permitted to accompany, or be accompanied by Chewy in the school setting. And any minimal services that have been provided, that are in the record there, are only those which are necessary in order for a 7-year-old child with autism to be able to see the benefit from their service animal in school, which is under the Illinois school code, that which he is entitled. There are very, appellants have argued in their brief and today, that Caleb does not independently control his service animal. There are very few things that a 7-year-old controls and commands without adult supervision in his life, as well as in the school setting. They're told when to go to the bathroom, when to get lunch, really when to walk in the hallway. And this is just one other thing that adult has some supervision on. But Caleb is attached to Chewy. They are accompanied together at all times, except those brief times that I referred to that are in the record. And for that to be the basis for this court to find that he is not accompanied, would be ignoring the plain meaning of the statute. The plain meaning is that an animal individually trained to perform tasks for the benefit of a student with a disability shall be permitted to accompany that student in and out of the classroom to all school functions. And Chewy, the circuit court found with clear and convincing evidence, is a service animal that fits that definition. And to overturn that decision would be finding that that finding was against the manifest weight of the evidence, or that the circuit court was making an arbitrary and unsupportable decision. Mr. Wright argued that we should look for guidance in the federal statutes. Is he correct? As I said previously, this is the only statute that speaks directly to a service animal in school. The federal statutes, as Your Honor pointed out to counsel during this argument, are more restrictive and are directed towards public accommodations. Clearly, the Illinois legislature had a different concept in mind when it passed this, when it enacted this statute, in that a school certainly has a different responsibility to a student than, for example, a hotel would have to a patron as a public accommodation. And because of that different responsibility, there are, in order to allow Caleb, a seven-year-old student with autism, to be accompanied by a service animal, there would be some additional responsibility on the part of the school district. And that is something that when the legislature enacted, their intent with this statute was really to make sure that students with disabilities had their service animals available to them at all times so that they could benefit from them when they did. And Caleb does benefit from Chewy. And Caleb does benefit from Chewy in the school setting as well as outside of the school setting. There's testimony in the record that Chewy keeps Caleb safe. He keeps him from running into unsupervised. He keeps him from running into streets, into parking lots. He helps him transition. They have a routine where they transition together. And Caleb was, at the time of the hearing, going to school on time without behavior incidents, which in the record shows that was not the case in previous years. And in addition, Chewy applies deep pressure to Caleb. And he has done that in the school setting. And that helps Caleb refocus so that Caleb can get back to the task of being a student and all the burdens that come with being a student. And in addition, Chewy, outside of the classroom, applies deep pressure so that Caleb can sleep through the night so that when he gets to school, he doesn't have to sleep during school. And there's testimony in the record that in the previous year, he would miss his speech therapy because he would be sleeping in school. And that hasn't, according to the record, that hasn't been happening this year. There seems to be some dispute, and I'm not sure that I understand the resolution of it, I'm just wondering whether the school had provided an aid for Caleb before Chewy was on the scene, and what the school chose to do regarding that aid once Chewy was there pursuant to the court order. What's your position on all that? Caleb did have a one-on-one aid for his educational needs, and that was stated in his individualized education program. And that was independent of Chewy. So what does that mean to say that he had a one-on-one aid during the course of a school day? That means that from the moment when his mother drops him off at school, that one-on-one aid is there to accept him at the door and take him to his classroom. She walks with him throughout the school. She assists him when he's in his classroom. And so instead of now holding Caleb's hand, she's holding the leash in this case. And instead of giving the commands to Caleb, she's giving some commands to Chewy. Okay, so there was some question, if I understood from the district's brief, about this causing difficulties for, for instance, who's walking the dog, or how does that work, and when is the dog taken out to be walked? What about dog? The record before you says that the one-on-one aid felt confident. She was able to set rules. And Chewy, in the record, it states that Chewy does not need to have bowel movements during the day. And that's not... What about being taken outside for urination? And I... That, I believe, is done during the recess period. Thank you. Thank you. Thank you, Your Honor. I just have a few points in response to a few of the items that Ms. Wakeland discussed. I think first on the issue as to whether or not the administrative penalties would be futile and inadequate, I think that it's important, she discussed a few times, relevance of the federal scheme. And I would just point out that the plaintiffs throughout the trial proceedings also sided to those same federal regulations. And I think that when it was inconvenient for them, they've now decided to ignore it. But I think that they initially looked at that, too, as a way of guiding the trial court, and I think also, again, yourselves. I think that she said that the district has different responsibilities under the state statute than the federal statute. I think that's the very reason for the administrative process, that it's a different responsibility for a school district and a classroom than a hotel and their patron. And that's the very reason why there's an administrative process that includes not just the review by a hearing officer, but a team decision made by a group of qualified professionals, and their decision can then be reviewed by a hearing officer. I think that that's exactly why it's important. She also said there's no... What would there have been to review if we weren't in court? I mean, before you knew whether Chewy was any good, or did what he was supposed to do, or what he could do for this child, the school district took the position from the very beginning, no, you can't bring the dog to school. Would that be correct? That's correct. There was nothing that was presented to the school district that convinced them that the dog met the definition of a service animal, and that that was only then made stronger after the plenary injunction before the November trial, because then there was actual evidence in the record. And I think if you look at the issue of what was actually in the record, it's not a case about what appeared on the surface, but what the record actually shows is, one, there are serious questions about whether or not the training is actually adhered to, and that the dog does nothing other than at the command of an adult handler, and even those things he does, nothing more than walking and sleeping during school day. I think the record implies what the dog is supposed to do. And if you look at testimony at trial, not what plaintiffs asserted in their brief, not what are in the affidavits, but what is actually in the record at trial, there's a lot of testimony about what the dog is supposed to have done based on the training. But there's very little record in the record from the plaintiffs about what the dog actually does during the school day and otherwise. Is Ms. Wakelin correct regarding the aid and how an aid had been provided for the child prior to Chewy's appearance? Yes, but I would say that the duties have fundamentally changed. She's gone from, as Ms. Wakelin described, from being an educational professional providing services to the student to being a dog handler who occasionally is able to assist the student. Of course, part of, I guess, what Judge Reese found is that this has helped her in her role as an educational assistant for the child. Is he wrong? I don't know that if you read her testimony that she would agree with that statement based on her testimony in court, that it makes her job easier. He's better behaved during the school day and he's less tired, isn't that correct? I think that if you read the testimony of school staff, both the aid who testified and particularly the speech language pathologist, they would say that his behavior is worse after having had Chewy rather than better. And I think that's clearly what the testimony shows, that there are new and increased behavioral concerns in the student that according to the testimony of the speech language pathologist, who I think was a very credible witness and really looked at this carefully, that that can be tied back to the dog and that there are serious behaviors that are a result of the dog being present, whether that's the student trying to get away from the dog and other behaviors that have arisen. Her testimony was that she was hopeful that this would be great because she wanted to recommend it for another student. And based on the experience with this student, she found that it was actually detrimental to him rather than beneficial. And that's the testimony of Ms. Wiesing in the record. What did Judge Freeh say about all this? He did not address that. In his written intercession, he merely said that the benefit that he saw was the child came to school. Thank you, counsel. I take this matter under advisement.